# In the United States Court of Federal Claims

No. 13-494 C

(Filed September 30, 2013)

| | |
|---|---|
| * * * * * * * * * * * * * * * *  * | |
| JACQUELINE R. SIMS, aka JRS  * | |
| STAFFING SERVICES,  * | Pre-Award Bid Protest; |
| * | Preliminary Tasks Set Forth in |
| *Plaintiff*,  * | the Solicitation As "Special |
| * | Contract Conditions" Which |
| v.  * | Will Occur Before a Task |
| * | Order Issues Under the |
| THE UNITED STATES,  * | Contract Are Not Contract |
| * | Performance and Are Not |
| *Defendant*.  * | Improper. |
| * * * * * * * * * * * * * * *  * | |

*Jacqueline R. Sims*, Lawrenceville, GA, *pro se*.

*Veronica N. Onyema*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Claudia Burke*, Assistant Director, *Luke A. E. Pazicky*, Trial Attorney, Washington, DC, for defendant.[1]  *Oleta Vassilopoulos* and *William Robinson*, United States Bureau of Prisons, Washington, DC, of counsel.

_____

## OPINION
_____

**Bush**, *Judge*.

_____

      [1]/  Until August 27, 2013, counsel of record for the United States was Luke A. E. Pazicky.

Plaintiff Jacqueline R. Sims, sole proprietor of JRS Staffing Services (JRS), filed her *pro se* pre-award bid protest complaint on July 19, 2013.  In her amended complaint filed July 29, 2013, Ms. Sims challenges the terms of Solicitation No. RFQP05151300011 issued by the United States Bureau of Prisons (BOP or Bureau).  The solicitation requests bids for educational services to be provided at the Federal Correctional Institution in Texarkana, Texas (FCI Texarkana).  In this protest, plaintiff seeks a permanent injunction and declaratory relief, and alleges "clear and prejudicial violations of Statute and Regulation in connection with the Government's plan to award a requirements contract whereby the Contractor would be required to commence performance of certain contract obligations prior to the time that appropriated funds are obligated or a valid order is issued." Compl. at 2.

The administrative record (AR) of this procurement was filed on July 29, 2013.  Briefing was filed according to an expedited schedule, and plaintiff was given an electronic filing account to avoid the inefficiencies associated with paper filings.  As discussed below, plaintiff has not shown that the terms of the solicitation violated procurement laws or regulations or were arbitrary or capricious.  Defendant's motion for judgment on the administrative record is therefore granted and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

## I.    The Solicitation

Solicitation No. RFQP05151300011, "Education Services at the Federal Correctional Institution Texarkana, Texas," was issued by the Bureau on March 18, 2013, AR at 32-76, and was amended on March 26, 2013, *id.* at 86-87.  The procurement is a 100% set-aside for small business concerns, and is described as

> an indefinite delivery/requirements type contract with
> firm fixed prices to a responsible entity for the provision
> of Spanish GED Instructor, Parenting Services Instructor,
> Testing Services Coordinator, Library Technician, and
> Lab Monitor for the male offend[e]rs at the Federal

> Correctional Institution (FCI) and the Federal Prison
> Camp (FPC) located in Texarkana, Texas.

*Id.* at 38.  Bidders were to submit their prices for a base year and four option years: the bidder would first specify a fully-burdened hourly rate for each educator position; the bidder would then multiply these hourly rates by the estimated number of annual hours for each position.  *Id.* at 36-37.

In these contracting circumstances, the court notes that the contractor's payments under the contract will be determined by the hourly rates set for the educator positions and the number of hours required by the Bureau for each position.  There is no mandatory minimum number of hours for any of the five positions identified in the solicitation.  *See* Def.'s Mot. at 3 n.3 (noting that "requirements contracts do not guarantee a minimum quantity of orders") (citation omitted).  Contract services would be provided in response to task orders issued under the contract.  AR at 42.

Price appears to be the primary factor which will determine award:

> The Government intends to make a single award to a
> quoter, pursuant to an affirmative determination of
> responsibility, whose quote, conforming to the
> solicitation, is determined to be most advantageous to the
> Government, considering lowest price.

AR at 57.  The bidders were on notice that the government reserved the right to award without discussions.  *Id.* at 37.  The solicitation states that "each initial offer should contain the offeror's best terms from a cost or price standpoint."  *Id.*

The solicitation also contains a variety of terms which discuss the obligations of the awardee.  Of most interest, in light of plaintiff's protest, is the description of the procedures for obtaining security clearances for the educators, and, in particular, the timing of these procedures.  On the subject of timing, the court notes that the solicitation distinguished between the *date of contract award* and the *effective date of award*.  AR at 51.  Before Amendment 0001 was issued, the solicitation indicated that the effective date of award would occur approximately one month after the date of contract award:

3

> It is anticipated that a contract award resulting from this solicitation will be made approximately May 17, 2013 with an anticipated effective date of award of June 17, 2013.

*Id.*

The solicitation provision governing procedures for obtaining security clearances for the educators, in its original form, stated that:

> The Contractor shall submit required documentation to initiate security clearance, within 5 calendar days from effective date of award of the contract and commence full performance of the services under this contract within 30 calendar days from the effective date of award.

AR at 51.  Thus, if the original anticipated contract schedule and the provision regarding security clearances had not been modified, the following anticipated contract schedule was described in the solicitation:

> | | |
> |---|---|
> | Contract Award: | May 17, 2013 |
> | Effective Date of Contract Award: | June 17, 2013 |
> | Security Clearance Documents Due: | June 22, 2013 |
> | Full Contract Performance: | July 17, 2013. |

*Id.*  One potential bidder, Ms. Sims, immediately requested that the timing of security clearance procedures be changed.

## II.    Amendment 0001

Here are the most relevant portions of plaintiff's request that security clearance procedures be scheduled differently:

> a.  Please clarify that the Contractor must submit required documentation to initiate security clearance upon receipt of a task order.

4

b.  Please consider allowing more time (at least 21 days) from the receipt of a task order and receipt of the security clearance forms for the Contractor to submit the required documentation to initiate security clearance.  Time must be allowed for recruitment/pre-screening, for the Contractor's staff to actually complete the forms, and for the Contractor to review the forms for completeness prior to submission to the BOP.

c.  Please consider deleting in its entirety the requirement that the Contractor commence full performance of the services under the contract within 30 calendar days from the effective date of award.  No services are to be provided under the contract, as services are provided in accordance with task orders.  Also, full performance of the services under any task order cannot commence until the Government completes the required security clearances, and this process often takes 6 to 8 weeks, or longer to accomplish.

AR at 77-78, 84-85.  The Bureau responded by amending the solicitation, and by simultaneously posting the changed language as a response to Ms. Sim's question/request on FedBizOpps, on March 26, 2013:

The date of award will be approximately 60 days prior to the Effective Date of Award.  The successor contractor will have 30 days from the date of award to provide the required documentation to initiate security clearances.  A Task Order should be issued by the institution on the Effective Date of Award.  The successor contractor will be required to begin performance within five (5) days of the issuing of the Task Order or within five (5) days of notification of the completion of the background checks, whichever is later.

*Id.* at 85 (Response to Bidder Question #11), 87 (Amendment 0001).

5

Thus, per Amendment 0001, the timing of security clearance procedures was now altered, so that bidders could anticipate the following contract schedule (if no delays were encountered in the procurement):

| | |
|---|---|
| Contract Award: | May 17, 2013 |
| Security Clearance Documents Due: | June 17, 2013 |
| Effective Date of Contract Award: | July 17, 2013 |
| Full Contract Performance: | July 22, 2013, or five days after security clearance procedures have been completed, whichever is later. |

AR at 51, 87.  Whether the amended terms of the solicitation regarding the timing of security clearance procedures were an improvement, from plaintiff's perspective, it is difficult to say.  The court now turns to plaintiff's continued efforts to remove any requirement that the awardee initiate security clearance procedures before a task order issues under the contract.

## III.   Ms. Sims Challenges the Terms of the Amended Solicitation

On March 26, 2013, the day that Amendment 0001 and the response to Ms. Sim's question were posted on FedBizOpps, Ms. Sims provided the Bureau with this commentary on the changes the BOP had made in the timing of security clearance procedures for the contract:

> Based on the above [changes], if a contract is awarded on *May 1, 2013*, the effective date of award would likely be *July 1, 2013* (60 days after the date of award) and a task order would likely be issued on *July 1, 2013* (the effective date of award).  However, based on the above, the Contractor would be required to initiate security clearances by *June 1, 2013* (30 days from the date of award).  This would be prior to the effective date of award, and prior to the issuance of a task order.

There is no guarantee that FCI Texarkana will actually issue a task order by/on the effective date of award, or that a task order will be issued at all.  Moreover, even if a task order is issued by/on the effective date of award, until an order is actually issued, it is unknown which of the five (5) services (Spanish GED Instructor, Parenting Instructor, Testing Services Coordinator, Lab Monitor, and Library Technician) will be ordered, or what quantity of sessions will be ordered, which would impact the personnel selected.

Since the Government contemplates award of an indefinite delivery/requirements type contract, no services whatsoever are authorized or will actually be purchased via the contract, and the initiation of the security clearances should not be tied to the award date or the effective award date of the requirements contract.

Please consider amending the solicitation to clarify the issue of when the Contractor must initiate security clearances so that it is clear that the successor contractor will have 30 days from *the issuance of a task order* to provide the required documentation to initiate security clearances.

AR at 88.  The contracting officer rejected Ms. Sims's request for further alterations to the timing of security clearance procedures:

In response to you[r] question, our thinking was that the estimated time (60 days) between the date the contract is signed (date of award) and the date that performance is to begin (effective date of award) would allow the contractor time to find prospective employees (estimated 30 days) and time for the BOP to have the background checks cleared (estimated 30 days).  This would help eliminate a lapse on services being provided from the old contract to the new which could not be avoided if the

7

> new contract was awarded and a task order issued.  Your
> proposal of the successor contractor having 30 days from
> the issuance of a task order to provide the required
> documentation to initiate security clearances could lead
> to a lapse in performance of 60 days or more from the
> end of the old contract to the beginning of the new
> contract.

*Id.* at 89.  The email from the contracting officer to Ms. Sims was sent on April 4, 2013.

Proposals responding to the solicitation were due on April 12, 2013.  AR at 33.  On April 11, 2013, Ms. Sims filed a pre-award protest with the Government Accountability Office (GAO).  *Id.* Tab 1.  Many of the legal theories presented by plaintiff in this suit were also raised by Ms. Sims before the GAO.  *See id.*  Six bids, including one from JRS, were received by the BOP.  *Id.* at 29; Compl. ¶ 6. On July 16, 2013, the GAO denied plaintiff's protest.  AR Tab 13; *see JRS Staffing Servs.*, B-408202, 2013 WL 3725152 (Comp. Gen. July 16, 2013) (*GAO Decision*).  On July 19, 2013, Ms. Sims filed her *pro se* bid protest complaint in this court.

## DISCUSSION

### I.    *Pro Se* Litigants

The court acknowledges that Ms. Sims is proceeding *pro se*, and is "not expected to frame issues with the precision of a common law pleading."  *Roche v. United States Postal Serv.*, 828 F.2d 1555, 1558 (Fed. Cir. 1987).  *Pro se* plaintiffs are entitled to a liberal construction of their pleadings.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers").  Here, despite the fact that plaintiff's briefs are set forth with a level of legal sophistication not normally found in most *pro se* submissions, the court has nevertheless examined the complaint and briefs thoroughly to be certain it has discerned all of plaintiff's legal arguments.

### II.   **Bid Protest Jurisdiction**

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

## III.    Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## IV.    Bid Protest Review

The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC*, 316 F.3d at 1319. An interested party whose direct economic interest in the procurement has been prejudiced by the government's actions has standing. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *AFGE*, 258 F.3d at 1302). In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a "non-trivial competitive injury which can be addressed by judicial relief" to meet the economic prejudice requirement. *Id.* at 1362.

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure.  *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential."  *Advanced Data Concepts*, 216 F.3d at 1058.

*De minimis* errors in the procurement process do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).  Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301

(D.C. Cir. 1971)).  If, on the other hand, the protestor has shown a significant error in the procurement process, the court must determine whether that error prejudiced the protestor, because both error and prejudice are required for the protestor to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  Plaintiff bears the burden of proof to establish prejudice.  *Bannum*, 404 F.3d at 1358.  "Prejudice is a question of fact."  *Id.* at 1353 (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## V.     Standing

Although defendant has not directly challenged Ms. Sims's standing to bring this bid protest in either its motion for judgment on the administrative record or its reply brief, standing is a threshold inquiry that the court must address.  *ITAC*, 316 F.3d at 1319.  As stated *supra*, the protestor must first show that it is an interested party, *i.e.*, that the protestor is an actual or prospective bidder for the services to be procured by the government.  *E.g.*, *Weeks Marine*, 575 F.3d at 1359.  The court notes, at the outset, that Ms. Sims is an actual bidder in this procurement and has won numerous contracts of this type.  Ms. Sims has also protested the terms of the solicitation both at the GAO and in this court.  In addition, the court has no reason to doubt that Ms. Sims would compete for the contract if the terms of the solicitation were amended to her satisfaction.  The court finds that Ms. Sims is both an actual and prospective bidder, thus satisfying the first element required to establish standing.  *See id.*

Whether Ms. Sims and JRS have suffered a non-trivial competitive injury, the second element of pre-award bid protest standing also referred to as prejudice, *id.* at 1362, is a closer question.  In order to address this inquiry into economic prejudice, the court must first decide whether plaintiff may introduce a declaration for the court's consideration which supports her allegations of prejudice.  Although defendant opposes plaintiff's attempt to supplement the agency's record with this declaration, the government acknowledges that this court has considered such declarations for the inquiry into prejudice or the weighing of factors relevant to whether or not injunctive relief should issue in a bid protest.  Def.'s Reply at 14-17.  In the circumstances of this case, the court sees no need to prevent plaintiff, proceeding *pro se*, from submitting a declaration which will facilitate effective judicial review of the question of prejudice.  *See Axiom Res. Mgmt., Inc. v. United*

*States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (stating that "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review'" (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005))).  For this reason, the court will permit plaintiff to supplement the record in this case with her declaration.

Defendant's only stated objective for the prejudice inquiry is to challenge plaintiff's showing of "prejudice on the merits."  Def.'s Mot. at 25-26 & n.11.  However, one of the cases relied upon by defendant for its prejudice arguments, *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009), addresses prejudice as it affects standing.  As this court has often commented, the inquiry into prejudice has two functions:  a first look at prejudice to verify the protestor's standing to bring the suit; and, a second look at prejudice to determine whether or not any errors proved by the plaintiff have been prejudicial to the protestor so as to justify relief from this court.  *See, e.g.*, *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 694-97 (2010) (discussing the two distinct analyses of prejudice required in bid protest cases).  Notwithstanding *Labatt*'s discussion of prejudice in the context of standing, both parties agree that the proper inquiry into prejudice and standing, in the pre-award context, is provided by *Weeks Marine*.[2]  Pl.'s Mot. at 7; Def's Mot. at 25; Def.'s Reply at 11 & n.3.

Several parallels between *Weeks Marine* and this protest are apparent.  In *Weeks Marine*, the protestor alleged that the challenged solicitation was irrational and that the company was not built to compete under such terms.  575 F.3d at 1360.  Further, the protestor asserted that the solicitation was an "unauthorized contract vehicle that violated procurement statutes and regulations and lacked a

---

[2]/ It should be noted that *Labatt* discusses post-award bid protest standing, not pre-award bid protest standing.  577 F.3d at 1378, 1380 (applying the "substantial chance" test for post-award bid protest standing).  Defendant has cited one pre-award protest decision issued by this court which, in determining whether the protestor had been prejudiced and thus had standing to protest the terms of a solicitation, applied both the *Weeks Marine* non-trivial competitive injury standard, 575 F.3d at 1362, and the *Labatt* "disparate treatment or particularized harm" standard, 577 F.3d at 1380.  *See ICP Northwest, LLC v. United States*, 98 Fed. Cl. 29, 35-38 (2011).  The court believes that *Weeks Marine* is the Federal Circuit decision most on point for the standing inquiry here.  The court acknowledges, however, that under the *Labatt* test for particularized competitive harm, plaintiff would be far from certain to possess standing to bring her suit.

12

rational basis." *Id.* at 1361 (internal quotations omitted).  Ms. Sims makes similar allegations here.

More specifically, the protestor in *Weeks Marine* established that the challenged solicitation, were the procurement to go forward, would likely have a direct monetary impact on the company's bottom line.  *Id.* at 1362.  The Federal Circuit concluded that the protestor had "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Id.*  Here, Ms. Sims, too, has persuasively described the significant economic impacts of the challenged solicitation's terms on her business model.  *See* Pl.'s Mot. at 8; Pl.'s Reply at 19-20; Sims Decl. ¶¶ 10-28.

In similar circumstances, the Federal Circuit found that the protestor had established a "non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine*, 575 F.3d at 1362.  Here, although defendant contends that Ms. Sims has "fail[ed] to substantiate any of the various injuries hypothesized in her motion," Def.'s Mot. at 25, the court must disagree.  Under *Weeks Marine*, plaintiff has demonstrated a non-trivial competitive injury and standing to bring her bid protest.

## VI.   Analysis of the Merits

### A.   Overview

Plaintiff presents an informative, if somewhat argumentative, overview of the parties' positions in this case:

> [I]t is clear that the Agency's position is that the requirement for the Contractor to provide the very personnel listed in the contract line items, as well as the requirement for the Contractor to perform the [Statement of Work (SOW)] tasks related to the background checks simply represents the cost of doing business with the BOP, as well as start-up costs that are the Contractor's responsibility. . . .  However, it is Plaintiff's position that the requirement for the Contractor to furnish the very personnel listed in the contract line items, as well as the

> requirement for the Contractor to perform the SOW tasks
> related to the background checks constitutes performance
> of [contract] obligations, for which a valid, funded order
> is required.

Pl.'s Mot. at 2.  In other words, the primary, if not the sole, dispute here is whether certain start-up activities for the contract at FCI Texarkana are properly viewed as *conditions* of contract performance or *actual* contract performance.  Both parties cite terms of the solicitation as support for their positions in this litigation.[3] *Compare* AR at 52 (describing security clearance requirements as a "condition of the contract"), *and id.* at 51 (setting forth the initial schedule for security clearance procedures under the solicitation section titled "Special Contract Conditions"), *with id.* (setting forth the initial schedule for security clearance procedures within a solicitation sub-section titled "Performance," which also describes the base year and option years schedule of contract performance), *and id.* at 87 (Amendment 0001) (setting forth the revised schedule for security clearance procedures and noting that the solicitation sub-section thus revised is titled "Performance").

As explained below, the court must agree with defendant that all obligations of the awardee to comply with security clearance procedures before a task order issues under the contract are properly viewed as conditions of contract performance, not actual contract performance.  The court agrees with plaintiff that these conditions of contract performance have some cost, and that there is some risk that these costs will not be recouped by the awardee under the requirements contract vehicle utilized by the Bureau.  The court also agrees with plaintiff that there are alternative ways of structuring a procurement which do not impose as great a risk of loss on the contractor.  Nonetheless, "[i]t is within the discretion of an agency to offer for competition a solicitation that imposes maximum risks upon the vendor and minimum burdens on the agency."  *GAO Decision*, 2013 WL 3725152, at *2 (citing *TN-KY Contractors*, B-291997.2, 2003 CPD ¶ 91, 2003 WL 21019207, at *2 (Comp. Gen. May 5, 2003)).

### B.    Special Contract Conditions

---

[3]/  Although plaintiff frequently refers to the security clearance requirements at issue in this suit as Statement of Work (SOW) requirements, many of the key solicitation terms regarding these requirements are found in a different section of the solicitation titled "Special Contract Conditions."  *See* AR at 51-52, 87.

According to plaintiff, the solicitation requires completion of the following tasks before any task order is issued:

> a) provide employees who are reasonably certain to be able to successfully complete the security scrutiny;
> b) ensure that the employees submit the required information and complete the necessary actions in a timely manner to complete their investigations as expeditiously as possible;
> c) pre-screen the employees, and,
> d) facilitate and coordinate the delivery of the employees to FCI Texarkana for fingerprinting, drug testing, and for the required security orientation.

Pl.'s Mot. at 5. Aside from the delivery of employees for the required security orientation, which appears to be an activity that occurs after a task order issues and is compensated at contract rates, *see* AR at 41, the court agrees that the awardee is obliged to perform many, if not all, of these start-up tasks described by plaintiff as a condition of the contract. The court does not agree with plaintiff, however, that these start-up tasks constitute contract performance.

Plaintiff's first argument regarding these start-up tasks is that because JRS would necessarily recruit and hire staff before it could submit security clearance documentation, plaintiff would be required to "perform" under the contract before the actual issuance of a task order, if JRS is awarded the contract. Pl.'s Mot. at 10-11; *see also* Pl.'s Reply at 5-7. Plaintiff attempts to draw a parallel between the individual line items in the contract (one for each educator position), and the recruitment and hiring of the educators. *See* Pl.'s Mot. at 11. However, the line items in the contract are for *hours of sessions provided* by each of the educators, not for the mere availability of the educators for FCI Texarkana. *See* AR at 39 (specifying the estimated session hours required of each educator position); *see also* Def.'s Mot. at 16 (noting that the "Description of Services" section of the SOW describes the sessions to be provided by the educators, whereas the requirements for security clearances are described in the "Institution Security" section of the SOW). There is no specific payment for the recruitment and hiring of educators mentioned in the solicitation – a bidder must recoup such costs, if services are ordered under the contract, in its fully-burdened hourly rate for each

session provided to the inmates by each educator.  AR at 37.  Thus, according to the express terms of the solicitation, none of the start-up tasks identified by plaintiff constitute compensable performance of the contract.

Plaintiff appears to argue that because its costs for recruitment and hiring must necessarily be included in its fully-burdened hourly rates of the educators, recruitment and hiring activities and expenditures must constitute contract performance.  Pl.'s Mot. at 11-13.  Plaintiff, however, fails to cite any authority for the proposition that start-up tasks are converted into contract performance merely because contractors are assumed to tailor their bids on fixed-price contracts so as to make a profit.  Pursuant to the express terms of the solicitation, the awardee would not begin performance until a task order has issued – under these terms, start-up activities which would occur before a task order issues are necessarily merely conditions of contract performance, not actual contract performance.  *See GAO Decision*, 2013 WL 3725152, at *1 (stating that "it is not improper for an agency to expect a vendor to incur start-up costs in advance of a task order being issued under [a] requirements contract" (citing *Special Operations Group, Inc.*, B-256312, 94-1 CPD ¶ 350, 1994 WL 258299, at *1-2 (Comp. Gen. June 6, 1994))).

### C.    Alleged Statutory and Regulatory Violations

Plaintiff has failed to demonstrate that the solicitation requires contract performance from the awardee prior to the issuance of a task order.  The solicitation, instead, requires the awardee to incur various start-up costs as a condition of the contract.  This holding undermines each of plaintiff's allegations that certain procurement regulations or statutes that address the timing of contract performance and expenditures have been violated by the BOP in the FCI Texarkana solicitation.

Nonetheless, the court will briefly address plaintiff's contentions in this regard.[4]  First, plaintiff lists certain provisions of the Federal Acquisition Regulation (FAR),[5] and states that

> § 16.503, § 52.216-18, § 52.216-19, and § 52.216-21 . . . do not authorize the Government to require the Contractor to perform tasks and obligations that are delineated in the SOW of the master requirements, so that the Contractor may get some kind of "head start" in performing work pursuant to a task order that may never be issued.

Pl.'s Mot. at 15-16.  Plaintiff's general thesis is that these FAR provisions preclude contract performance before a task order issues in this type of contract.  *See* Compl. ¶ 54; Pl.'s Reply at 7-9.

Because the court has found that the solicitation in this case has not required the awardee to commence performance before the issuance of a task order, nothing in the above-mentioned regulations cited by plaintiff is relevant to the dispute in this matter.  In addition, the cases cited by plaintiff in her reply brief which generally describe the duties of the government in requirements contracting are similarly inapposite.  *See* Pl.'s Reply at 10 (citing *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003); *Technical Assistance Int'l., Inc. v. United States*, 150 F.3d 1369, 1371-72 (Fed. Cir. 1998)).  Although plaintiff contends that the start-up tasks are burdensome and impose an impermissible risk to the awardee in this procurement, *id.* at 12-13, the court finds nothing in the regulations or caselaw cited by plaintiff to support this contention.  Plaintiff's allegations of regulatory violations fail because they are based on a misreading of the solicitation, which does not require contract performance before a task order issues under the contract,

---

[4]/ Although the court would normally limit its inquiry to the arguments presented in plaintiff's motion and reply brief, because plaintiff is proceeding *pro se* the court has also considered the arguments made in the complaint.  None of plaintiff's arguments alleging statutory or regulatory violations is persuasive.

[5]/ All citations to the FAR are to the 2012 version of Title 48 of the Code of Federal Regulations.

and because these regulations do not operate to limit the risk that may be allocated to the contractor for the start-up activities required in this procurement.

Next, plaintiff turns to FAR 52.232-18, the "Availability of Funds" clause incorporated in the solicitation. Pl.'s Mot. at 16-18. Again, this alleged regulatory violation is premised on plaintiff's assertion that the solicitation requires that the awardee commence performance before a task order has issued or, more specifically, before certain notifications have been received from the contracting officer:

> the terms of the solicitation violate the regulations at § 52.232-18, as well as the regulations at § 32.703-2(c), which prohibit the Government from accepting any services under a contract conditioned upon the availability of funds until the Contracting Officer has given the Contractor notice, to be confirmed in writing, that funds are available.

*Id.* at 17-18. The same argument is elaborated upon in plaintiff's reply brief:

> [T]he BOP has included in the solicitation express terms that require the Awardee to commence performance before the Government obtains and obligates funds, and before the Government provides the Awardee with the required, written notice of funds availability. This is a clear and prejudicial violation of FAR § 52.232-18, which requires the Government to provide the Awardee notice of funds availability, and it also violates FAR § 32.703-2(c), which bars the Government from accepting any services unless and until the required notice has been provided.

Pl.'s Reply at 16.

This argument fails for three principal reasons. First, as plaintiff concedes, the solicitation does not specify when a funding notice is to be provided to the awardee. Pl.'s Mot. at 17. Thus, there can be no facial violation of FAR 52.232-18 for the simple reason that the solicitation does not indicate that any

contract performance will occur before a notice of funding availability is sent by the contracting officer to the contractor.

Second, plaintiff's basic assumption that commencement of contract performance occurs the moment plaintiff initiates start-up tasks of recruitment and hiring, *see* Pl'.s Mot. at 17 (asserting that "the administrative record demonstrates that the Plaintiff would be required to perform key SOW tasks that are included in Plaintiff's unit pricing before appropriated funds are available"), is contrary to the terms of the solicitation, as noted *supra*.  Plaintiff's theory that the "Availability of Funds" clause is violated by the security clearance conditions imposed on the contractor is premised on that faulty assumption:

> [R]eceipt of the Government's notice of funds availability is a condition precedent to the Contractor's ability to perform.  Moreover, in the absence of a valid, funded order, Plaintiff would have no basis or legal authority to perform any SOW tasks.

*Id.*  Here, however, the court has found that the awardee would not be required to begin contract performance before a task order (and, presumably, a notice of funds availability) has issued.  The violation of the "Availability of Funds" clause alleged by plaintiff, and the violation of the FAR sections cited by plaintiff, will not occur because the conditions of the contract that require the awardee to begin certain start-up tasks will not trigger contract performance before a task order has issued.[6]

Third, as defendant notes, the "Availability of Funds" clause addresses the timing of the obligation of funds by the government.  Def.'s Mot. at 19-21.  As plaintiff concedes, the government will not obligate funds under the contract until a task order actually issues.  Pl.'s Mot. at 13 (citations omitted).  Defendant confirms that plaintiff's point of concession is correct as a matter of law.  Def.'s Mot. at 19-21.  The start-up tasks related to security clearance procedures, which will occur

---

[6]/  The court need not address plaintiff's contention, unsupported by any authority, that the "Availability of Funds" clause operates to the benefit of contractors.  Compl. ¶ 69; Pl.'s Mot. at 17.

before a task order issues, will not obligate funds of the BOP; thus, no violation of the "Availability of Funds" clause is evident in the terms of the solicitation.[7]

Finally, plaintiff's opening brief presents a cursory one-sentence comment implying, perhaps, that the Solicitation violates the Anti-Deficiency Act, 31 U.S.C. § 1341 (2006). *See* Pl.'s Mot. at 18 ("These terms are also tantamount to the BOP encouraging the Contractor to perform certain key SOW tasks on a voluntary basis, which would be a violation of [the] Anti-Deficiency Act, 31 U.S.C. [§] 1341."). Having reviewed the complaint, plaintiff's motion, and plaintiff's reply brief, the implied alleged violation might concern certain provisions of § 1341, but also might concern 31 U.S.C. § 1342 (2006), a separate but related provision of the Act. To fully address plaintiff's legal theories, however cryptically presented, the court will consider both statutes.

If plaintiff's argument focuses on § 1341, the alleged violation would consist of the inappropriate timing of obligations or contracting in advance of funding availability or appropriations. If, on the other hand, plaintiff's argument focuses on § 1342, the alleged violation would consist of the government's inappropriate acceptance of voluntary services. The court considers each statute in turn.

Section 1341 states in relevant part that:

> An officer or employee of the United States Government
> or of the District of Columbia government may not–
> (A) make or authorize an expenditure or obligation
> exceeding an amount available in an appropriation or
> fund for the expenditure or obligation;
> (B) involve either government in a contract or obligation
> for the payment of money before an appropriation is
> made unless authorized by law . . . .

---

[7]/ Neither has FAR 32.703-2(c), which precludes the acceptance of "services under a contract" by an agency before a notice of funding availability has been provided to the contractor, been violated here. As defendant argues and as the court has held, the start-up tasks related to security clearances which condition contract performance are not contract services. Def.'s Mot. at 21-22. Thus, the BOP will not accept "services under a contract" at the time these start-up tasks are accomplished by the awardee.

31 U.S.C. § 1341(a)(1)(A)-(B).  In her complaint, plaintiff contends that "[w]hen awarding a contract before funds are available, FAR § 52.232-18 can protect the Government from violating the Anti-Deficiency Act, provided that the Government does not encourage Contractor performance, or accept any services before appropriated funds are obligated."  Compl. ¶ 68.  In her reply brief, plaintiff states that "[t]he terms of the solicitation that require and compel the Awardee to perform SOW tasks before such time as the BOP obligates funds, and before such time as the BOP is legally obligated to pay for the services or perform the contract is a clear and prejudicial violation of 31 U.S.C. § 1342."  Pl.'s Reply at 18 (citing *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997)).  Defendant explains, however, that no funds have been obligated by the solicitation's conditions regarding security clearance start-up tasks which must occur before a task order issues under the contract.  Def.'s Mot. at 22-23.  The GAO came to the same conclusion, and the court must agree.  *See GAO Decision*, 2013 WL 3725152, at *2 ("Since the protester's allegations do not demonstrate that the agency is making an award in excess of an available appropriation, they provide no basis to question the agency's actions.").  Plaintiff has not shown any violation of § 1341(a)(1)(A).

Defendant next turns to the question of whether the BOP has conceivably violated § 1341(a)(1)(B) by involving the United States in a "contract or obligation for the payment of money" prior to the availability of appropriated funds.  Because this requirements contract with no minimum does not obligate funds until a task order issues, defendant argues that the contract cannot violate § 1341(a)(1)(B) during the start-up period.  Def.'s Mot. at 23.  The court must agree.  As plaintiff has conceded, "because there is no minimum amount, or any amount of services that the Government is legally required to order, [this] requirements contract is essentially a 'contract to potentially contract.'"  Pl.'s Mot. at 14.  During the start-up period, no obligation for the payment of money (before the availability of an appropriation) occurs, and the timing provisions of § 1341(a)(1)(B) remain inviolate.  Plaintiff has not met her burden to show that the start-up tasks required by the solicitation violate § 1341(a)(1)(B).

As for § 1342, this provision of the Anti-Deficiency Act states in relevant part that:

>An officer or employee of the United States Government
>or of the District of Columbia government may not
>accept voluntary services for either government . . . .

31 U.S.C. § 1342. Plaintiff complained to the GAO that the start-up tasks required of the awardee in this procurement constituted voluntary services in violation of the Anti-Deficiency Act. AR at 138. The GAO soundly rejected this argument: "Where, as here, however, services are furnished pursuant to a formal contract, they are not voluntary within the meaning of the Antideficiency Act." *GAO Decision*, 2013 WL 3725152, at *3 (citing 31 U.S.C. § 1342; *Gen. Servs. Admin.; Real Estate Brokers' Comm'ns*, B-291947, 2003 WL 21947188 (Comp. Gen. Aug. 15, 2003); *Fed. Trade Comm'n*, A-23262, 7 Comp. Gen. 810, 811, 1928 WL 1724 (Comp. Gen. June 26, 1928)).

Plaintiff does not challenge the GAO's determination that services furnished in the context of a formal contractual relationship are not voluntary. Indeed, plaintiff concedes that "the Awardee will be performing the SOW tasks of recruiting, hiring, and prescreening employees, as well as submitting completed applications for the background checks not of its own free will, but as a direct result of the BOP's express demands." Pl.'s Reply at 17. Plaintiff argues, nonetheless, that the start-up tasks are indeed voluntary in nature because they will "be provided 60 days before [the BOP] hopes to obtain and obligate appropriated funds." *Id.* at 18. Plaintiff cites to no authority holding that the start-up conditions of a contract are tantamount to voluntary services which would violate § 1342. To the extent that plaintiff argues that the solicitation's security clearance procedures that condition contract performance before a task order issues are "voluntary," so as to violate § 1342, *see* Compl. ¶ 70; Pl.'s Mot. at 18; Pl.'s Reply at 17-18, the court agrees with the reasoning of the GAO and rejects this argument.[8] In sum, the court finds no violation of statute or regulation in the arguments presented by plaintiff in this suit.

---

[8] Defendant also argues that the start-up tasks at issue in this suit cannot be considered to be "voluntary *services*," because they are not contract services under the solicitation. Def.'s Mot. at 24 n.10. The court need not decide whether defendant's contention has merit, because it is clear that these start-up tasks do not constitute "voluntary services" that might violate § 1342. *See* Def.'s Reply at 10 (noting that the GAO has "found that formal contracts by their nature contain mutually binding rights and obligations, which render any services that are provided under them required, not voluntary").

### D.      Allegation of Arbitrariness

Plaintiff has also alleged that the solicitation terms are arbitrary and capricious, but did not present specific arguments in this regard until she filed her reply brief.  To the extent that plaintiff has attempted to show that the start-up tasks of the contract lack a rational basis, Pl.'s Reply at 2-3, the court must disagree. Continuity of educational services in a correctional facility provides a rational basis for requiring the awardee to prepare its personnel for performance before a task order issues under the contract.  *See* AR at 29 (explaining why a "lapse in service would be detrimental to the BOP").  Although some bidders may be discouraged by the conditions set forth in the solicitation, and other scheduling alternatives might have been available to the BOP, the court does not find the special contract conditions set forth in the solicitation to be irrational.  As the Federal Circuit has held,

> the minutiae of the procurement process in such matters
> as . . . the timing of various steps in the procurement . . .
> involve discretionary determinations of procurement
> officials that a court will not second guess.

*E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citing *Widnall v. B3H*, 75 F.3d 1577, 1582 (Fed. Cir. 1996); *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994); *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993)).

### CONCLUSION

Ms. Sims contends that the allocation of risk in the solicitation regarding start-up tasks is improper, but has failed to muster legal argument which meets her burden to show that the solicitation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[9]  5 U.S.C. § 706(2)(A).

---

[9]/  In her reply brief, plaintiff argues that the requirements contract set forth in the solicitation contains an illusory promise from the BOP, so that no enforceable contract will have been formed at the time the start-up tasks must be accomplished by the awardee.  Pl.'s Reply at 14-15.  Defendant persuasively rejects this general attack on the validity of requirements contracts, and notes that mutuality of obligation exists because the government promises the

continue...

This court has noted, adopting principles stated in GAO decisions, that such allocations of risk in solicitations are unobjectionable:

> In other words, the "mere presence" of risk in a solicitation does not render it inappropriate or improper. *Katmai Info. Techs., LLC*, B-406885, 2012 CPD ¶ 277, at *4 (Comp. Gen. Sept. 20, 2012).  To the contrary, "[r]isk is inherent in most type[s] of contracts, particularly fixed-price contracts," *Supreme Foodservice GmbH*, B-405400.1, 2011 CPD ¶ 244, at *7 (Comp. Gen. Oct. 31, 2011), and an agency retains the discretion "to offer for competition a proposed contract that imposes maximum risks on the contractor and minimum burdens on the agency[.]" *Katmai Info. Techs., LLC*, B-406885, 2012 CPD ¶ 277, at *4.  It is the offeror's responsibility to "account for [such risk] in formulating its proposal." *Id.*

*FirstLine Transp. Sec., Inc. v. United States*, 107 Fed. Cl. 189, 208 (2012) (alterations in original).  Under the standard of review required here, the court must deny this pre-award bid protest.  Because plaintiff's bid protest has not succeeded on the merits, the court need not consider whether plaintiff has proved prejudicial error on the part of the government and need not inquire further into the factors that might justify injunctive relief.

Accordingly, it is hereby **ORDERED** that

(1)    Plaintiff's Motion for Judgment on the Administrative Record, filed August 12, 2013, is **DENIED**;

(2)    Defendant's Motion for Judgment on the Administrative Record, filed August 26, 2013, is **GRANTED**;

---

[9]/ ...continue
awardee the "exclusive right to fill orders under the resulting contract." Def.'s Reply at 9 (citations omitted).

(3)     Plaintiff's Motion to Supplement the Administrative Record, and to Add to the Court's Record, filed September 3, 2013, is **GRANTED**;

(4)     The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint with prejudice; and

(5)     Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
Judge